Case number 243863. Christina Henry v. Southern Ohio Medical Center. Oral arguments not to exceed 15 minutes per side. Mr. Unger, you may proceed for the appellant. Good morning. Morning. May it please the court, my name is Brian Unger. I represent Christina Henry and I'd like to reserve three minutes for rebuttal. Very well. I want to lay some groundwork here. This case is not about the COVID-19 vaccine. It's not about the efficacy of the vaccine or the danger imposed by the, or any alleged danger imposed by the unvaccinated. It's not reasonably disputed that SOMC, Southern Ohio Medical Center, would have let Ms. Henry do her job if she would have done weekly nasopharyngeal testing. They've done so for approximately 300 other people. What this case is about is the duty to accommodate under Title VII. And under Groff, which was decided by the Supreme Court in 2023, that duty is not fulfilled by merely assessing the reasonableness of a particular accommodation. And as this court has held more than once, the duty to accommodate includes the duty to reasonably attempt accommodation. And the facts... Doesn't the defendant have to know what accommodation a plaintiff is requesting? And isn't that one of the issues? She never really said, you know, what accommodation would work for her. Sure. So, first point, she did mention that she would self-screen. She did suggest an accommodation. But for the defendant, I believe that the duty to reasonably attempt accommodation includes some requirement to negotiate. And that did not happen here. And where does that come from? What case do you have in the Title VII religious liberty context that would suggest that? It's not from the Sixth Circuit. There is a Ninth Circuit case, Heller. And I apologize, I do not have that citation handy. It was cited in the Cappuccio case, which we submitted a 28-J letter to the court about. But I think that aligns with what the Sixth Circuit has historically held. Historically held where? In what kind of cases? So, there was the Robert Bosch case. And is that an ADA case? No, it was Title VII. It was a Title VII case. I believe it was a Sunday work case. That's where you see a lot of these cases coming from. But essentially, the employer put all of the onus on the employee to suggest accommodation. Or they said, if you need somebody to work Sundays for you, you know, you go find them. We're not going to help you at all. Well, sure. But they knew what the thing was that he wouldn't do, which is work on Sunday. Here, though, all she said is, I won't do any kind of testing. I won't test. I won't get the vaccine. And then she proposed one thing, which is I'll self-screen and I won't come to work if I feel ill. So, I guess I don't know how the employer is supposed to. It's like saying, well, could you work Sunday morning or Sunday afternoon? Like, in your Bosch case, the employee says, I won't work on Sundays. I'm not sure the employer has to say, well, how about Sunday afternoon? No, he said I won't work on Sundays. She said I won't test. So, I don't agree with that characterization. Her written request, which I do have in front of me, says I cannot be assaulted by a foreign body being inserted into my nasal passages. Right away, that draws issue with the nasopharyngeal testing. She takes issue with the substances in the test being potentially harmful. And as she later clarifies via affidavit, that was due to the blood-brain barrier and how ethylene oxide may break that barrier and get into the brain. They were without that information because they never asked her one simple question, which is, well, would you do a different test? And I think at a minimum, they have a duty to ask that one simple question here. And what's your best authority for that? Is it this Heller case from the Ninth Circuit? Well, frankly, I think the Cappuccio case, not that it's binding in any way on this Court or even on the Ninth Circuit, but I think it's pretty factually on point. In that case, it was a police officer and she originally objected to testing, but then she submitted, like later down the road after some back and forth had happened, she submitted two home tests. So from there, they're saying, well, obviously she was not opposed to all testing. There's a difference in what you might write. And this all happened very quickly, right? September 3rd, she submits this. She's gone on the 17th. On the undue hardship sort of component, how is this case any different than Wise? Than Wise? Well, in Wise, the objection was to testing when asymptomatic. So that was basically an objection to all testing. It just mattered when she might take the test. The undue hardship component, the undue hardship to the defendant, how is this any different?  I mean, there's hospitals in both situations, nurses in both situations dealing with vulnerable patients. Sure. And our assertion is that Ms. Henry would have taken a test. Her assertion is that she would have taken a test. I mean, she swore the same by affidavit. I don't think it was proper to find that she objected to all testing, no matter the type. So, again, if SOMC would have allowed her to take a nasopharyngeal test, they could have allowed her to take a different one, too. She would have preferred saliva, but she came back and said, I would have done oropharyngeal, I would have done anterior nares. Doesn't she say in her deposition, or doesn't she agree with somebody else's testimony, that she would not have taken the throat swab test? I know what you're talking about. That was the ethics, Brian? Yeah, Brian. Yes, Brian. That was not in the context of the COVID-19 test. I would say, first off, well, first off... Well, anything going into your throat is going into your throat, right? And if your objection is something entering your body... I think it's different when you're just having a dialogue saying, well, you know, what do you think about this, what do you think about that, rather than saying, what would you do to keep your job? Because what also happened with Ms. Brian, somewhere during that conversation, Ms. Henry said that she would mask. And if you look at her written request, she states a pretty clear objection to masking, but later she wears it. And so I think, really, that there is an underlying finding here that she would not negotiate, and that is wrong. That's wrong on the basis that she masked after she said it violated her beliefs to mask. So knowing that, why would the employer not negotiate? Why would the employer just not assume that her religious beliefs actually don't... She discovered that her religious beliefs don't require her to not mask. And to that, I would say, why wouldn't they presume that she could also discover that her beliefs allow her to take a different type of test? Right, but doesn't she have to come forward and tell them? I mean, otherwise you're going to have employers saying, I don't know, this masking thing doesn't really seem consistent with your religion. Are you sure it's consistent with your religion? My understanding of this religion is it doesn't require masking. That seems pretty intrusive. The ADA does require that. The ADA requires the requesting party to propose an accommodation. Title VII does not. There was the Texas hydraulics case out of Tennessee. I think that clearly explained that difference. And I believe in that case, though it's not this court, their interpretation was that this court does require the employer to explore in some way different possibilities. Under the ADA? No, no, no. Under Title VII. Under Title VII. And that it is, again, not proper to put the onus on Ms. Henry. She has to request a reasonable accommodation, does she not? Generally, yes. She has to say, I need accommodation. Do you have a copy of her September 3, 2021 letter in front of you?  Okay, it's your position that she objected to only the nasal swab test and that she would be open to other tests. Look at page two, though. And about the middle of the page, she says, further, participating in medical experiments such as COVID testing or vaccine is also a violation of my religious beliefs. COVID tests have an emergency authorization by FDA and not an approval. There she uses test, the plural of test, which to me means that she opposes not only the nasal swab test, but the other test. Isn't that a reasonable interpretation of that sentence? I think based on the facts as they were at this time, in her mind, all she knew was the nasal. Why does she use the plural test? And how does she only know that that's the available test? She got this email that says there are other tests that we can do. She affirmed that she saw that email. She did not affirm that she saw the FAQ attached. Okay. And that is the only place where they mentioned the oropharyngeal test for people with medical issues. In the law, generally, we don't assume that if your employer gives you notice of something and it's a multi-page document, like if I buy a new cell phone and it's a multi-page document, it's presumed I read the contract, right? So I don't know why you can say, oh, I didn't read page two. I mean, she didn't sign it. It's not as though it was a contract. Right. Fair. But I would just say that on her— The employer put her on notice that there were these other things available, and then they have to— To an extent that could be argued. Frankly, if you look at Mr. Applegate's affidavit, I believe he even says at the time he talked to her he was only aware of the nasopharyngeal test. So I don't think it was well known, even within SOMC, that there were other tests available. Okay. I'm out of time. I will—unless Your Honors have any other questions, I'll save my time for the rest. Any further questions, Judge Mathis? No. All right. Thank you, Counsel. You'll have your three minutes rebuttal. Good morning. Good morning, Your Honors. My name is Ben Landau-Bysheville. I represent the Applee Southern Ohio Medical Center, or SOMC. I'm here today to urge Your Honors to affirm the district court's grant of summary judgment for SOMC on both claims brought by the appellant, Ms. Henry. I want to start by giving a real quick overview of how SOMC sees this case. From our perspective, what's really fundamental is there have been three very distinct versions of Ms. Henry's asserted religious objection in this case. The first version is the version during her employment. She submits three letters saying very clearly, I'm opposed to COVID testing, making no distinction between different kinds of tests. She's asked twice what accommodation she would accept, and both times she says, stay in my position with no testing. And just to be clear, the first time I'm referring to is her accommodation form, which is on the record at page 268. The second time is her conversation with Teresa Bryan that's referenced. She specifically says in her letter she's opposed to anything that goes in her nose. She tells Teresa Bryan she's opposed to anything that'll go in her throat. Even at the time she files her complaint at the district court, she says, I'm opposed to COVID testing. Again, making no distinction between different types of tests. That's version one of her purported religious objection. Version two is what we see during discovery. In her deposition, she says for the first time that she was supposedly open to saliva testing this whole time. She designates an expert witness to testify about the efficacy of saliva testing. She deposes SOMC's microbiologist at length about the burdens of validating saliva testing. Her counsel questions SOMC's decision makers about, shouldn't she have been offered saliva testing, given her objection to anything that would go in her nose and mouth? That's version two. Version three is what emerges in opposition to summary judgment and remains the case as of this appeal. Version three of Ms. Henry's purported religious objection is, well, in opposing summary judgment, she says nothing about saliva testing at all. She pivots. She brings up for the first time ever that her objection was supposedly this whole time only to nasal pharyngeal testing, based on a never-before-stated belief that nasal pharyngeal testing could break the blood-brain barrier and that she supposedly would have been willing to accept oral pharyngeal or anterior nares tests, tests that go in your nose and throat, respectively, the whole time, and she makes no effort to explain what seems like a pretty obvious contradiction here. She's now appealed, but she doesn't disagree. She doesn't challenge the district court's holding that exempting her from vaccination and all testing would have been an undue hardship. She just says she should have been offered these other forms of testing that she brought up for the first time in litigation. And we think that argument fails for a number of reasons. The first one is that she shouldn't be able to create a genuine issue of material fact on what seems pretty clearly to be a sham affidavit. In her deposition testimony, she says, I submitted this letter. The letter says nothing can go in my nose. She agrees that she told Teresa Bryan nothing can go in my throat. Now she's saying, I would have taken tests that would go in my nose and in my throat. Under these circumstances, it seems very clearly like an attempt to create a sham factual issue to avoid summary judgment, which would then knock out oral pharyngeal and anterior nares tests as options and leave only the question of the undue burden as to saliva testing. We think the district court got that one right also, and that it's clearly decided under Wise versus Children's Hospital Medical Center of Akron, which said an employer doesn't need to wait for a safety risk to materialize in order to find undue burden, and which said that a hospital's judgments during the pandemic about how to protect the safety of its patients are entitled to a great deal of deference. Henry's not introduced anything to contradict our evidence on the undue burden, and we would argue that issue's not even properly before the court because she didn't oppose it on summary judgment. She didn't oppose our argument on undue burden as to saliva testing at all. Now, if the court were to find that her affidavit is not a sham, just to continue through the analysis, she can't state a prima facie case based on her religious objection as asserted in that affidavit. First, there's no conflict. She says her religion is she can't risk harm. The harm she says she's worried about is breaking the blood-brain barrier. She's not introduced any evidence that nasopharyngeal testing entails a risk of any harm or breaking the blood-brain barrier specifically. The court's able to assess as a matter of law whether there is a conflict. The court did so in the DeVore decision, and that alone would doom her prima facie case. On top of that, the reason why she objects to nasopharyngeal testing specifically is not a religious objection. Her reason is she thinks it can break the blood-brain barrier. Even if you look at her affidavit, the language that she uses in there, she says her religion says she can't risk harming the body, and then she says I understood that nasopharyngeal testing can break the blood-brain barrier. She's not even asserting that that belief comes from her religion. We briefed the issue extensively, and we would just say earlier this year in the Prita decision, this court stated that Title VII does not grant a right to all plaintiffs fungible enough to cover anything a plaintiff dislikes in the workplace. We would submit that if the court were to reach this issue that this would be the right case to draw a line and say parsing the difference between different kinds of invasive COVID tests based on their perceived relative medical harms is a secular concern and is not a religious concern. But even if Henry could state a prima facie case, her claim would still fail, because as this court is well aware, she never said anything during her employment, which would have triggered an obligation for SOMC to offer her alternative forms of testing. Our counsel brought up the Groff decision. I think this court is aware there's nothing in Groff that would require an employer to offer accommodations that conflict with the religious beliefs that an employee has expressed. An employer is not obligated to say, hey, what you put in this letter, did you really mean it, or did you mean something else that contradicts what you put in the letter? There's no obligation to do that. As was pointed out, in Groff, the employee was very clear about what he was asking for. He was asking not to work on Sunday. In this case, Ms. Henry was not clear with what she was asking for. The language of Groff is, faced with an accommodation request like Groff's, it would not be enough, dot, dot, dot. Henry's accommodation request was not like Groff's. She was not clear about what she was asking for. There was no obligation for SOMC to interrogate her about what she really meant. Maybe she was clear about what she was asking for. We would say that that's actually probably the more likely explanation. She was clear, in which case, what she was asking for was to be excused from vaccination and all testing, which would clearly be an undue hardship. There's no obligation, as opposing counsel was claiming, to negotiate and arrive at an accommodation through bargaining. The Cappuccio case at a district court in the Ninth Circuit does not apply here. This court in the Kaiser versus St. Jude's not too long ago said there's no obligation for an interactive process at all under Title VII religious accommodations. If there's no obligation for an interactive process at all, there clearly can't be an obligation to engage in bargaining, such that an employee would be allowed to state a kind of maximalist bargaining position, this is the most that I want, and then wait until that's rejected, and then change her mind. There's no authority for that position at all. In fact, the law is very clear that an employee is entitled only to any reasonable accommodation, not to their preferred accommodation. So to the extent that Henry's defense is that she was being strategic in withholding information to try to get her preferred accommodation, rather than a reasonable accommodation, we think that should fail. Her letters, everything she put in writing, I think, speaks for itself. I don't think anybody could read her letters and think that she was open to any form of COVID testing. She states at least five different reasons in her letter why she's opposed to COVID testing. None of them are specific to nasal pharyngeal testing. So we think those letters speak for themselves. Her best argument really is about the phone call with Ken Applegate and Teresa Blankenship, two SOMC administrators, in which she alleges that she asked about whether other forms of testing were available, or whether less invasive testing was available. First of all, the first time she unequivocally says that she said that is in her sham affidavit. In her deposition, she's equivocal about it. But even if she did ask that, it would have been reasonable for SOMC to assume at that point all the objections she had expressed in the prior two weeks still applied. She already said, nothing in my nose, nothing in my throat. She never said, hey, what I told you before, that doesn't apply anymore. She's just saying, are there less invasive forms of testing? At best, most generously, it would be hypothetically, raise saliva testing, which is an undue hardship and SOMC couldn't have provided. Provided, even there, there are problems, though, because her letters, I think, also conflict with saliva testing. The second reason would be, you know, the reason Henry's accommodation process didn't result in an accommodation for her is her own choices here. She chose to state a blanket objection to all testing. She chose to specifically say that she would not accept the forms of testing that she now says she would have accepted. She chose, when asked what accommodations she would accept, to say, remain in my position with no testing. So if that resulted in, you know, her not being accommodated, that's a result of her choices. And she had the last word after that phone conversation. She submitted another letter, again, stating, I object to COVID testing, again, not making any distinction. And she received a letter from SOMC's administrator, Vicki Noel, telling her she was going to be placed on leave of absence if she wouldn't agree to testing. The first sentence of that letter, which is page 604 of the record, says, I'll quote it, it is my understanding you've submitted a religious exemption to SOMC's vaccine compliance requirement and requested to be exempted from the COVID-19 vaccine as well as exempted from the weekly COVID-19 testing requirement, end quote. After receiving that, Henry never says, hey, you misunderstand me. I do not object to all testing. I only object to this specific form of testing. So it seems pretty clear from the evidence. Her objection probably was to all testing. Even if she privately had some other ideas, she now claims she never expressed that to SOMC, and we think that that would doom her failure to accommodate claim. I can refer to my briefs on the retaliation claim, and I'm happy to address any questions from the court. Any questions, Judge Larson? No. Any questions, Judge Mathis? Thank you, Counsel. Two minutes or three minutes rebuttal, Mr. Unger. Thank you. Thank you, Your Honors. Excuse me. With my three minutes, I would like to just address the sham affidavit issue. It is a very material fact here, as Counsel just acknowledged, they believe it's the best argument that Ms. Henry has here. Whether she asked during that phone call if there was another type of test she could take, if a jury were to believe that, that would destroy their argument that they were not on notice that she would take a different test. Well, she allegedly asked if there were other tests, but she didn't say she would take them, did she? She said in her deposition, I asked if there were any other forms of testing that were acceptable. Yeah, she's asking, but then the next step, she didn't say if there were, I would accept this test or that test. I mean, she didn't go to the second part of that, did she? Well, but she was told immediately that there were not. That's her testimony. Oh, so you're saying if they had said that they would offer other tests, then she may have said she would consent? Well, first, I think that would have caused them to go and research whether they could offer another test, because according to their affidavits, that's a blankenship and applegate. They never did that. They said had she asked, we would have gone and looked. And, you know, she says, well, if they would have asked, if I would have done one of those other two, I would have said yes. And, again, the problem is that there was no question. Isn't this, again, like Sunday? Because previously she said things can't go in my body. They can't go in my throat. They can't go in my nose. Then she says, is there another form of test I can take? I don't know why the employer is supposed to understand. Well, yes, there is, but it's a thing that would go in your nose or your throat. Like, they have to say that? It's like, I won't work on Sunday. Does the employer now have to say, well, how about after sundown on Sunday? Well, for one, I mean, there are some beliefs that are just not going to be so definite, that there's going to be so definite an answer to. But, two, I don't think it's right to just look at her writing in a vacuum. It's not as though she has entered some kind of writing competition and that she was not aware that she had to say the exact perfect thing and cut off every angle that SOMC could come up with to deny her request. So that's all I'll say on that. Her affidavit was not an attempt to create a sham fact issue. It's consistent with her testimony, and I would ask that the court be reversed. All right, thank you very much. Thank you. Any further questions? The case will be submitted. You may call the next case.